UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DERRICK ALTMAN,                             ) | |
| Plaintiff,       ) | |
| v.      ) | Case No. 14-cv-30190-KAR |
| CAROLYN W. COLVIN,     ) | |
| Acting Commissioner of Social     ) | |
| Security Administration,     ) | |
| Defendant.     ) | |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION TO
REVERSE OR REMAND THE DECISION OF THE COMMISSIONER AND DEFENDANT'S
MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(Dkt. Nos. 16 & 18)
September 1, 2015

ROBERTSON, U.S.M.J.

I. INTRODUCTION

This is an action for judicial review of a final decision by the acting Commissioner of the Social Security Administration ("the Commissioner") regarding the plaintiff's entitlement to Supplemental Security Insurance ("SSI") pursuant to 42 U.S.C. § 1383(c)(3). Plaintiff Derrick Altman ("Plaintiff") asserts that the Commissioner's decision denying him such benefits – memorialized in a May 14, 2013 decision by an administrative law judge ("ALJ") – is in error because the ALJ improperly failed to grant controlling weight to the opinion of Plaintiff's mental health care provider and failed adequately to explain what weight, if any, he assigned to other evidence in the record. Plaintiff has moved for judgment on the pleadings, or, in the alternative, that the Commissioner's decision be remanded for further proceedings (Dkt. No. 16). The Commissioner has moved for an order affirming the decision of the Commissioner on the grounds that the ALJ's decision is supported by substantial evidence (Dkt. No. 22).

1

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will allow Plaintiff's motion in part and deny the Commissioner's motion. The case will be remanded for further proceedings.

II.     PROCEDURAL BACKGROUND

Plaintiff applied for SSI benefits on May 6, 2011, alleging an onset of disability beginning on April 12, 2008 (Administrative Record ("A.R.") at 161-169). The claim was denied initially and on reconsideration (*id*. at 121-124, 126). Following a hearing held by videoconference on November 9, 2012, with Plaintiff, his attorney and the hearing monitor in Pittsfield and the ALJ and a vocational expert in Springfield, the ALJ issued his decision finding that Plaintiff was not disabled and denying his claim (*id.* at 11-24, 31). The Appeals Council denied review (*id.* at 1-6). The ALJ's decision thereby became the final decision of the Commissioner. This appeal followed.

III.    DISCUSSION

A. Standard of review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for a rehearing. *See* 42 U.S.C. § 405(g) and 1383(c)(3). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)). "Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion." *Taylor v. Astrue*, 899 F. Supp. 2d 83, 84 (D. Mass. 2012) (citing *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). In applying the substantial evidence standard, the court must

be mindful that it is the province of the ALJ, and not the courts, to resolve issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991). So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770. "A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim." *Taylor*, 899 F. Supp. 2d at 85 (citing *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996)). The court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner" or to "remand[] the cause for a rehearing." 42 U.S.C. § 405(g).

    B. Entitlement to SSI

Entitlement to SSI requires a showing of disability and financial need. *See* 42 U.S.C. § 1381a. Because the Commissioner does not challenge Plaintiff's financial need, the sole point at issue is whether Plaintiff is disabled within the meaning of the statute. A claimant is disabled for purposes of SSI if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 404.1520. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See id*. *See also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See id*. "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "Work-related mental activities generally . . . include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id*. at *6.

The claimant has the burden of proof through step four of the analysis. At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can perform notwithstanding limitations or restrictions. *Goodermote,* 690 F.2d at 7.

C. The ALJ's decision

In determining that Plaintiff did not meet the standard for disability, the ALJ conducted the five-part analysis required by the regulations. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 11, 2011, the application date (A.R. at 16). At steps two and three, the ALJ found that Plaintiff had certain severe impairments – major depression and post-traumatic stress disorder ("PTSD") with psychosis, primarily paranoia – but concluded that these impairments did not meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id*. at 16, 19). In particular, the ALJ found that Plaintiff's severe mental impairments gave rise to mild restrictions in Plaintiff's activities of daily living; marked difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and caused no episodes of decompensation of extended duration (*id*. at 19-20). Before proceeding to step four, the ALJ found that Plaintiff had the RFC to perform a full range of work at all exertional levels, except that, because of drowsiness caused by his medications, he should not work at heights or around moving machinery. He found that, due to concentration difficulties, Plaintiff should be limited to positions involving simple one-to-two step tasks taught by demonstration with rare changes in routine, working in relative isolation without interactions with co-workers and with only one to two interactions with a supervisor every four hours (*id.* at 20). At step four, the ALJ found that Plaintiff had no past relevant work experience (*id*. at 22). Finally, at step five, relying on the

testimony of a vocational expert, the ALJ determined that Plaintiff could perform jobs that existed in significant numbers in the regional and national economies (*id.* at 23). Consequently, the ALJ deemed Plaintiff ineligible for SSI benefits (*id.* at 23-24).

   D.  Plaintiff's contentions

Plaintiff seeks reversal or remand based on the following three related contentions: (1) the ALJ improperly failed to give controlling weight to the opinion of his treating psychiatrist, Ann Potter, M.D., that Plaintiff was unable to work and failed adequately to explain his reasons for discounting her opinion; (2) the ALJ failed properly to evaluate or explain the weight he assigned to opinion evidence from Margaret Stephenson, Ph.D., a consulting psychologist, and he failed to explain the weight he assigned to the opinions of Richard Milan, Jr., Ph.D. and John Gambill, M.D., each of whom completed a disability determination based on a record review; and (3) the ALJ relied, to a degree unspecified in his opinion, on an investigative report prepared by the Cooperative Disability Investigation Unit ("CDI Unit") whose contents did not necessarily contradict Plaintiff's claims of disability based on mental impairments (Dkt. No. 17 at 8-17).[1] In essence, these arguments amount to a single contention: the ALJ failed to give controlling weight to opinion evidence from an acceptable treating source, and failed adequately to explain this finding and the weight he assigned to other evidence, medical and otherwise, in the record. For the reasons set forth below, the court agrees.

---

[1] The CDI Unit's primary purpose is to obtain evidence that can resolve claims of fraud before any benefits are paid. Disability fraud includes, but is not limited to, exaggerating symptoms or lying about disabilities. *See McQuin v. Comm'r of Soc. Sec.*, No. 3:12-cv-1704, 2014 WL 1369674, at *9 n.7 (N.D. Ohio March 31, 2014).

      i.      <u>Summary of relevant medical opinion and related evidence</u>

Plaintiff claims that he was wrongfully incarcerated after he was arrested by a North Adams police officer engaged in racial profiling, that this experience was profoundly traumatizing, and that he has been unable to work due to limitations caused by his mental impairments since his release from incarceration (*e.g.*, A.R. at 396-424).  Plaintiff began treating with psychotherapist Linda McGinley at the Brien Center in North Adams on September 15, 2010 as soon as he could obtain insurance coverage after his September 2009 release from incarceration (*id.* at 268).  He was diagnosed by Ms. McGinley with major depressive disorder, PTSD, and anxiety (*id.* at 276).  He first saw Dr. Potter in January 2011 for medication management, when she diagnosed Plaintiff with PTSD and major mood disorder.  She observed that Plaintiff was still symptomatic and unable to work or function outside of his house (*id.* at 313).  According to the administrative record, Dr. Potter saw Plaintiff again in July and September 2011, then on an approximately monthly basis beginning in February 2012.  She consistently diagnosed Plaintiff with PTSD, major mood disorder with psychosis, and anxiety (*id.* at 330, 339, 347-350, 353-354).  She consistently observed Plaintiff's mood to be dysphoric and anxious or one or the other (*id.* at 313, 330, 331, 347, 348, 349, 353, 354).

In February 2012, Dr. Potter completed an EAEDC Medical Report in which she represented that Plaintiff had mental health impairments that affected his ability to work and were expected to last 6 to 12 months (*id.* at 338).  She indicated that he was markedly limited in his ability to sustain most mental activities associated with work during a normal workday and workweek.  She checked a box indicating he would be likely to be absent from work more than four days during a month, and noted that it was unlikely he would be able to keep a job because of his anxieties and that he had trouble keeping appointments, leaving his house, and traveling in

public (*id.* at 339-340). In late October 2012, Dr. Potter and Ms. McGinley jointly completed a second EAEDC Medical Report. They confirmed a diagnosis, established as of September 15, 2010, of PTSD and major mood disorder with psychosis (*id.* at 361). Dr. Potter and Ms. McGinley jointly indicated that Plaintiff's affect was depressed, tearful, and worried; that he was unable to concentrate; that his speech was confused and slow and his thought process panicked and ruminating and including flashbacks and racing thoughts; that his thought content was obsessive and that he feared people were out to get him; and that he heard voices and noises, thought people were touching him, and that someone was sending him messages in code (*id.* at 360). Dr. Potter, joined by Ms. McGinley, stated that Plaintiff's impairments interfered significantly with virtually all aspects of his daily living, and opined that Plaintiff had mental health and cognitive impairments expected to last more than a year that made him unable to work (*id.* at 362-363). Nowhere in the Brien Center records is there an indication that Plaintiff's treating care providers perceived him to be malingering.

At the hearing before the ALJ, Plaintiff testified that he did not want to leave the house, was scared all the time, felt like people were sending him messages, had difficulty sleeping, was "so depressed that people [did not] even want to talk to him," did not like being around groups of people, and did not think he could keep to a work schedule (*id.* at 46, 48-51, 55-56). Despite being steered away from the subject by his attorney, he repeatedly returned to his arrest and its sequel (*id.* at 46-47, 51, 53-54). He cried during the hearing, something he testified happened "a lot" (*id*. at 53-54).

At the conclusion of the hearing, the ALJ stated that he intended to refer the case for review by a consultative examiner (*id*. at 66). Plaintiff met with Margaret Stephenson, Ph.D., on January 18, 2013. Dr. Stephenson's report indicated a diagnosis of depressive disorder not

otherwise specified; anxiety disorder not otherwise specified; and alcohol abuse in remission (*id.* at 436, 439). Based on testing, she scored Plaintiff in the severe impairment range with respect to memory and in the moderate impairment range with respect to calculations. She stated that Plaintiff might have difficulty maintaining attention and concentration and working well with others and she assigned him a GAF score of 50[2] (*id*. at 438-439).

Although he did not indicate his intention to do so at the hearing, the ALJ apparently requested an investigation by the CDI Unit following the hearing. The investigator conducted very limited surveillance of Plaintiff (*id.* at 372-373). For purposes relevant to this decision, the most significant portion of the CDI Unit report concerned the investigator's report of her conversation with unnamed "officials" from the North Adams police department. These unnamed officials purportedly told the investigator that, in 2012, Plaintiff had been observed on multiple occasions out in the general public in the company of others, including standing outside of a package store, and had been seen intoxicated on several occasions, as well as being belligerent and engaging in physical altercations with neighbors. According to these unidentified officials of the North Adams police department, several people had reported to the police department that Plaintiff was "highly intoxicated" (*id.* at 373-374). The investigator never spoke with Plaintiff, his significant other, any family members, or any of his neighbors (*id*. at 365-435).

---

[2] "GAF" stands for Global Assessment of Functioning, which is a numeric scale that may be used by mental health clinicians and physicians to rate, on a subjective basis, the social, occupational and psychological functioning of adults. *See Rivera v. Astrue*, 9 F. Supp. 2d 495, 496, n.1 (E.D. Pa. 2014). The most recent version of the American Psychiatric Association's Diagnostic and Statistical Manual no longer employs GAF scores. *See Navedo v. Colvin*, Civil Action No. 14-30015-KPN, 2014 WL 6983358, at *3 n.2 (D. Mass. Dec. 9, 2014). The SSA has nonetheless indicated that it will continue to receive into evidence and consider GAF scores. *See id.* (citing SSA Administrative Memorandum 13066 (July 22, 2013)).

    ii.  <u>Weight of the treating physician's opinion</u>

  "A treating source is defined by 20 C.F.R. §§ 404.1502, 416.902 as a patient's own physician, psychologist or other acceptable medical source who has provided medical treatment in an ongoing way." *Ross v. Colvin,* C.A. No. 13-11089-PBS, 2014 WL 587849, at *6 (D. Mass. Feb. 14, 2014).  As a physician with a long-standing treatment relationship with Plaintiff, Dr. Potter was an "acceptable medical source" as that term is defined in the relevant regulations.  *See* 20 C.F.R. §§ 404.1513(a) and 416.91(a).  With respect to the nature and severity of a claimant's impairments, "[a]n administrative law judge must give controlling weight to the opinion of an [acceptable] 'treating source' when that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with substantial evidence in the record." *Taylor v. Astrue*, 899 F. Supp. 2d 83, 87 (D. Mass. 2012); *see also King v. Astrue*, Civil No. 09-337-P-H, 2010 WL 4457447, at *4 (D. Me. Oct. 31, 2010).  In the context of a mental health impairment, objective findings or "'medical signs,' *see* 20 C.F.R. § 404.1512(b)(1), are defined, in relevant part, as 'psychological abnormalities which can be observed' and which 'can be medically described and evaluated.' *Id*. § 404.1528(b).  Such abnormalities, in turn, include 'abnormalities of behavior, mood, thought, memory, orientation, development, or perception.' *Id.*" *Polanco-Quinones v. Astrue*, 477 Fed. Appx. 745, 747 (1st Cir. 2012) (unpublished).

  The ALJ acknowledged that Dr. Potter was an acceptable treating source.  He claimed to give her opinions "significant, but not controlling probative weight" because, according to the ALJ, Dr. Potter's opinions were inconsistent with the longitudinal history, as set out by the ALJ, and with an observation made by a staff member in the SSA field office; were inconsistent with an ability on Plaintiff's part to have drafted a 29-page "journal" describing the effects of his allegedly illegal incarceration; were based on Plaintiff's subjective assertions which, according

10

to the ALJ, were not borne out by mental status examination findings in the medical records; were brought into question by observations of North Adams police officers interviewed by an investigator from the CDI Unit; and were offered on a form provided by Plaintiff's lawyer, which purportedly amounted to a two-page checklist containing "scant analysis." The ALJ prefaced his reservations about the treating source's opinions by noting that they were "solicited to accommodate [Plaintiff's benefits] application" (A.R. at 21-22).

The ALJ's reasons for declining to give controlling weight to Dr. Potter's opinion do not stand up to scrutiny. First, it would be legal error for the ALJ to reduce the weight he assigned to Dr. Potter's reports because they were "solicited to accommodate this application" (*id.* at 21). *See Arroyo v. Barnhart*, 295 F. Supp. 2d 214, 220-221 (D. Mass. 2003). The ALJ presumably would not have made the comment if he did not consider the fact significant. He did not explain to what degree he allowed this impermissible factor to influence his decision to discount the weight he assigned to Dr. Potter's opinions. Second, while the ALJ stated that he declined to give controlling weight to the treating source opinion evidence because it was inconsistent with the "longitudinal history" (A.R. at 21), the ALJ's longitudinal history is drawn, with minor exceptions, from Plaintiff's treatment records at the Brien Center, in which Plaintiff is consistently diagnosed with PTSD and major mood disorder with psychosis, and generally observed to be functioning very poorly. "It is . . . difficult for the court to understand how the opinions of the treating physician, whose long history with the claimant is demonstrated by the record, is contradictory to that record." *Arroyo*, 295 F. Supp. 2d at 222. That an unidentified member of SSA Field Office staff member observed, on a single occasion, that Plaintiff was neat, polite, and cooperative cannot carry significant weight. One comment in a record – particularly from an unidentified non-medical source – is not substantial evidence that would

justify discounting the weight assigned to opinion evidence from an acceptable treating source. *See Bouvier v. Astrue*, 923 F. Supp. 2d 336, 350 (D.R.I. 2013) (single comment that claimant was doing "well" insufficient to undermine treating source opinion). Third, as a lay person, the ALJ was not qualified to determine whether the contents of Plaintiff's 29-page journal addressing the traumatic impact of his arrest and imprisonment were inconsistent with Dr. Potter's opinions about Plaintiff's mental impairments and the resulting limitations on his ability to work. *See Nguyen*, 172 F.3d at 35 (as lay person, ALJ was not qualified to interpret raw medical data in functional terms). A lay person might equally conclude that the journal was wholly consistent with abnormalities of behavior, mood, thought, memory, orientation, development, or perception documented by Dr. Potter: the document appears obsessive, paranoid, perseverative, and angry (A.R. at 396-424, 360-362). Fourth, Dr. Potter's observations and opinions about Plaintiff's mental health impairments were based on psychological abnormalities which she (and Ms. McGinley) observed, and which they medically described and evaluated. *See* 20 C.F.R. § 404.1512(b)(1). The ALJ committed legal error in discounting Dr. Potter's observations and opinions because they were, in his view, based on Plaintiff's "subjective assertions" (A.R. at 22). *See Polanca-Quinones*, 477 Fed. Appx. at 746-747 (Commissioner "wrong" that psychiatrist's report lacked objective findings where psychiatrist completed forms identifying signs and symptoms such as generalized anxiety, persistent disturbances of mood or affect, decreased energy, difficulty thinking, and memory impairment). Fifth, while it is the ALJ's province to weigh conflicts in the evidence, *see, e.g., Irlanda-Ortiz*, 955 F.2d at 769, in the unusual circumstances of this case, where criminal charges brought against Plaintiff based on an arrest by the North Adams police department were dismissed prior to trial, plaintiff had sued the department for racial profiling, and his claim of being targeted by

12

the department was given some credence by Margaret Stephenson, Ph.D., who performed a consultative examination at the ALJ's request,[3] the ALJ should have been cautious about relying on this source as a basis for discounting the weight he assigned to Dr. Potter's opinion evidence. Furthermore, while the hearsay information from the North Adams police department might, if credited, cast doubt on Plaintiff's claims of sobriety, it was not inconsistent with the abnormalities of behavior, mood, thought, memory, orientation, development, or perception observed by Dr. Potter (and Ms. McGinley) or the work limitations Dr. Potter ascribed to Plaintiff. Finally, viewed in its entirety, Dr. Potter's opinion evidence was not offered in the form of a checklist with scant analysis (A.R. 338-340, 360-363).

Moreover, "[w]hile the ALJ . . . stated the weight he gave to [Dr. Potter's] opinion – namely, 'significant' weight – he did not sufficiently explain himself and the court has some difficulty following his reasoning." *Taylor*, 899 F. Supp. 2d at 89. At step two of the ALJ's analysis, despite having purportedly accorded Dr. Potter's opinion evidence "significant" weight (A.R. at 19), the ALJ found that Plaintiff had only mild restrictions in his activities of daily living, a finding that cannot easily be reconciled with Dr. Potter's opinions about the effect of Plaintiff's mental impairments on his activities of daily living (*id*. at 362). It appears that the ALJ's RFC reflected Dr. Potter's diagnoses of major mood disorder with psychosis and paranoia, in that he acknowledged Plaintiff's concentration difficulties by limiting him to simple and routine one to two step tasks taught by demonstration, and to positions that could be performed in relative isolation (*id*. at 20). The ALJ did not, however, address Dr. Potter's opinion that

---

[3] Plaintiff told Dr. Stephenson that he believed he was a target of the police, who had the power to harm him by actions such as planting drugs on him. He reported fearing that the police would either hurt him or set him up to incarcerate him, and told Dr. Stephenson that the police drove past his house very slowly every day. His significant other, who attended his appointment with Dr. Stephenson, confirmed that the police regularly patrolled past the house (A.R. at 437-438).

13

Plaintiff's anxiety issues would result in absences from work at a frequency that, the vocational expert testified, would eliminate Plaintiff's ability to engage in substantial gainful activity (*id.* at 64, 340), nor did he adequately address her opinion that Plaintiff's level of distraction would cause him to be markedly limited in his ability to maintain attention and concentration for extended periods (*id.* at 339). The vocational expert testified that if distraction caused an individual to be off task 25% of the time, that person also would not be able to engage in substantial gainful activity. "[A]lthough an ALJ need not adopt all or any part of a particular provider's report, he must state his reasons for adopting only a portion of it." *Kenerson v. Astrue*, No. 10-cv-161-SM, 2011 WL 1981609, at *5, n.7 (D.N.H. May 20, 2011) (citing *Rawson v. Astrue*, Civil No. 09-469-BW, 2010 WL 2923902, at *2 (D. Me. July 19, 2010)). Lacking an adequate explanation from the ALJ about his treatment of opinion evidence from an acceptable treating source, this court cannot meaningfully review the ALJ's decision. *See Snow v. Astrue*, No. 10-cv-609-SM, 2011 WL 4828685, at *4 (Oct. 12, 2011).

      iii.    <u>The ALJ's treatment of other evidence in the record</u>

The difficulty caused by the ALJ's failure adequately to explain his consideration and treatment of Dr. Potter's opinion evidence is compounded by his failure to explain what weight he assigned to other evidence in the record. At the conclusion of the hearing, the ALJ stated that he intended to request a psychological examination by a consultative examiner (A.R. at 66). Plaintiff met with Dr. Stephenson on January 18, 2013 and her report was prepared on or around February 10, 2013 (*id.* at 436). To be sure, Dr. Stephenson's report is somewhat inconclusive. It is nonetheless significant in providing support for Dr. Potter's opinion insomuch as Dr. Stephenson concluded that Plaintiff might "have difficulty in maintaining attention and concentration and working well with others at this time" and assigned him a GAF score of 50,

which reflects a clinical, albeit subjective, judgment of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) *or* . . . serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." Diagnostic and Statistical Manual of Mental Disorders 34 (American Psych. Assoc. 4th ed. 2000). GAF scores are not necessarily reliable and the court is not suggesting that the GAF score assigned by Dr. Stephenson compelled a conclusion of disability based on mental impairment. *See Hall v. Colvin*, 18 F. Supp. 2d 144, 153 (D.R.I. 2014).[4] Here, however, the GAF score clarifies, to some degree, that Dr. Stephenson, the consultative examiner, had serious reservations about Plaintiff's ability to work, and, in this respect, Dr. Stephenson's opinion is consistent with the opinion evidence of the acceptable treating source (A.R. at 438-439). The ALJ's decision completely fails to explain what weight, if any, he assigned to the consultative examination report that resulted from an examination he requested be performed (*id*. at 66-67).

The ALJ's decision quoted extensively from reports prepared after record reviews by state agency medical consultants, raising an inference that they carried some significant measure of weight in his decision. He apparently adopted the assessment of one of them, John Gambrill, M.D., that Plaintiff had mild restrictions in activities of daily living (A.R. at 18-19). Again, the ALJ failed to explain what weight he assigned to these reports. He merely noted that "consideration had been given" to these reports and that "[i]t is noted that in reaching . . . conclusions regarding the severity of the claimant's impairments and the resulting limitation in his functioning, the medical source opinions by state medical examiners have been considered"

---

[4] It is noteworthy that the ALJ included an earlier GAF score of 60 in his longitudinal analysis – *in italics* – and ignored the GAF score of 50 subsequently assigned by the consultative examiner (A.R. at 17). There is some merit to Plaintiff's accusation of "cherry picking" by the ALJ (Dkt. No. 17 at 10). It is well-settled that an ALJ may not pick and choose only the evidence that supports his position. *See, e.g., McQuin*, 2014 WL 1369674, at *4.

15

(*id*. at 18, 22). "Reliance on a non-treating, consulting examiner's opinion is disfavored where the consultant does not have an expert report in the record" and where the consulting examiner does not have access to the more comprehensive information that was available to the treating source. *Ross*, 2014 WL 587849, at *7. Both state agency consulting examiners prepared their reports in 2011 (one in August and one in November) before Dr. Potter offered her opinions in February and October of 2012 (A.R. at 18, 340, 363). "The adoption of evaluations made by non-examining physicians, who evaluate medical evidence for a state agency, over that of a treating physician should be looked on with disfavor." *Conte v. McMahon*, 472 F. Supp. 2d 39, 49 (D. Mass. 2007). Here, the court has no basis on which to evaluate the ALJ's treatment of the former vis-à-vis the latter because the ALJ has failed to explain to what degree he credited the reviewing physician reports and what weight he assigned to them. *Cf. id.*

Nor has the ALJ explained the weight he assigned to the contents of the CDI Unit report.[5] "[A] CDI investigation may be appropriate in certain circumstances," *Robert v. Astrue*, 688 F. Supp. 2d 29, 37 (D. Mass. 2010). "[T]o the extent a [CDI] report provides factual rather than interpretive data, and to the extent the [ALJ] provides the claimant with an opportunity to address the report . . . the report may be given appropriate weight based on all the circumstances." *Id.* at 38 (internal citation omitted). Plaintiff's representative was notified of the report after the hearing, and chose not to request a supplemental hearing or propound interrogatories to address its contents (A.R. at 259). He reasoned that, to the extent the report

---

[5] It was presumably the ALJ who referred Plaintiff's case to the CDI Unit for investigation. The reasons given in the report for the investigation were a "[q]uestion of malingering" (A.R. at 366), and "inconsistencies in the medical evidence and [Plaintiff's] activities of daily living" (*id.* at 368). Plaintiff's treating care providers never suggested that he was malingering and the purported inconsistencies in the medical evidence and Plaintiff's activities of daily living are not apparent to the court.

contained factual data it either supported Plaintiff's contentions – because the investigator's (very limited) observations of Plaintiff's conduct revealed no inconsistencies between the medical evidence and Plaintiff's hearing testimony on the one hand and the investigator's observations on the other – or could not be verified or clarified because it came from unidentified sources (A.R. at 260-261). Indeed, neither the police "officials" with whom the investigator spoke, nor the third parties who allegedly provided information to the police department were identified in the report (*id.* at 373-374).

In footnote 2 in the ALJ's decision, he referred to the information about Plaintiff's alleged public intoxication as hearsay that would require much more surveillance before it could be credited because of the third hand nature of the information (*id.* at 17). Nonetheless, the ALJ apparently relied on this same evidence to discredit Plaintiff's testimony and his reports about his condition to his treating providers (*id.* at 19). The ALJ's apparently inconsistent treatment of the CDI Unit report is confusing. Moreover, although the report was, somewhat after the fact, disclosed to Plaintiff, the report's reliance on information from undisclosed sources (unidentified police officials and third parties who purportedly provided information to the police department) raises due process concerns that the ALJ may not have fully appreciated. *See Hinck v. Colvin*, Civil Action No. 13-1389-JWL, 2015 WL 859082, at *3 (D. Kan. Feb. 27, 2105) (violation of due process for ALJ to consider contents of CDI Unit report that claimant cannot refute or otherwise respond to). Because of the unverified and unverifiable nature of the information in the CDI Unit report, and the fact that the information that the ALJ apparently considered in his credibility determination came from the North Adams police department, an organization with which Plaintiff had an actively antagonistic relationship, the report cannot, in the court's view, be treated as substantial evidence that a reasonable mind could accept as adequate to support a

finding about Plaintiff's credibility that would, in turn, reflect on the reliability of opinion evidence from a treating source. *See Knox v. Astrue*, 660 F. Supp. 2d 790, 814 (S.D. Tex. 2009) (even where investigators spoke with plaintiff, CDI Unit investigators' report about plaintiff's communicative abilities not sufficient to support ALJ's rejection of medical evidence of cognitive impairments); *cf. Taylor*, 899 F. Supp. 2d at 90 (ALJ's evaluation of other source opinion evidence inadequate where ALJ relied on second hand observations of physicians treating Plaintiff for physical rather than mental impairments).

In sum, the court finds that the ALJ erred as a matter of law by failing to provide an adequate explanation for according Dr. Potter's opinion evidence less than controlling weight as to the nature and extent of Plaintiff's impairments, and by failing to explain what weight, if any, he assigned to other evidence in the record. The errors in this case are material in that they may have affected its outcome. *See Taylor*, 899 F. Supp. 2d at 90; *Snow*, 2011 WL 4828656, at *5. In these circumstances, Plaintiff is entitled to a remand to the Appeals Council pursuant to sentence four of 42 U.S.C. § 405(g). *See Snow,* 2011 WL 4828656, at *5 (citing *Seavey v. Barnhart*, 276 F.3d 1, 10, 12 (1st Cir. 2001) (remand to allow ALJ to correct errors is warranted where ALJ provided insufficient explanation of his decision)); *see also Simpson v. Colvin*, 2 F. Supp. 2d 81, 92 (D. Mass. 2014) (remanding case to Appeals Council pursuant to 42 U.S.C. § 405(g) when ALJ failed adequately to explain his decision).

## IV.  CONCLUSION

For the reasons stated above, the Commissioner's motion for an order affirming the decision (Dkt. No. 18) is DENIED, and Plaintiff's motion for judgment on the pleadings (Dkt. No. 16) IS DENIED in part and GRANTED in part. This case is REMANDED to the Appeals Council for further proceedings consistent with this opinion.

It is so ordered.

                                          /s/ Katherine A. Robertson
                                          KATHERINE A. ROBERTSON
                                          United States Magistrate Judge